NO SUMMONS ISSUED SEP 086972

___ FILED ___ ENTERED
___ LODGED ___ RECEIVED

SEP 29 2017     RE

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

UNITED STATES OF AMERICA, ex rel. by
MICHAEL BROWN,

                Plaintiff,

v.

TRIPLE CANOPY, INC.,

                Defendant.

CIVIL NO: **17-CV-01479** JCC

COMPLAINT AND JURY DEMAND
FILED UNDER SEAL
PURSUANT TO 31 U.S.C. §3730(b)(2)

Date Action Filed: September 29, 2017

# FILED UNDER SEAL

---

COMPLAINT AND JURY DEMAND
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

This is a civil qui tam action brought on behalf of the United States of America, ex. rel. by Michael Brown, against Triple Canopy, Inc., subject to the qui tam provisions of the Civil False Claims Act, pursuant to 31 U.S.C. §§3729-3733.

A written disclosure of substantially all material evidence and information the Plaintiff-Relator possesses was served on the United States Government pursuant to 31 U.S.C. §3730(b)(2) on September 14, 2017. A copy of this complaint will be served on the United States Government pursuant to 31 U.S.C. §3730(b)(2) and Rule 4(i) of the Federal Rules of Civil Procedure on September 29, 2017. This complaint is filed in camera, under seal, and may not be served upon the Defendant until further order of this Court.

## I. NATURE OF THIS ACTION

In 2010, Defendant Triple Canopy, a private security company was awarded a $1.8 million subcontract to provide security services in Kuwait. Additional funds were awarded under the subcontract in 2011 totaling over $260 million and again in 2016 totaling over $57 million. In sum, the total subcontract amount for these services awarded to Triple Canopy has been over $320 million.[1]

Under the subcontract, Defendant Triple Canopy was required to provide base security support services for United States Army installations throughout Kuwait. This included maintaining a force of sufficiently skilled personnel to support Kuwait installations 24 hours a day 7 days a week, and providing sufficient labor to maintain 24 hour force protection. Defendant Triple Canopy failed to provide either the necessary personnel, or training for those personnel, that were necessary for Triple Canopy to perform base security support services in Kuwait. Instead, Triple Canopy made false statements and provided falsified records to the Government regarding the security services it provided at the Kuwait installations under the

---

[1] Search results for subcontract 11KBOSSSC0051 awarded to Triple Canopy Inc., https://goo.gl/JfmxQV (last visited Sept. 29, 2017)

COMPLAINT AND JURY DEMAND - 1
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

subcontract.

Based upon personal knowledge, relevant documents, and investigations of Counsel, Relator Michael Brown, through his undersigned attorneys, brings this qui tam action on behalf of the United States of America pursuant to the FCA. Plaintiff-Relator seeks to recover treble damages sustained by, and civil penalties and restitution owed to, the United States Government.

## II. JURISICTION AND VENUE

1. This Court has jurisdiction over the claims the Relator brings on behalf of the United States under the FCA pursuant to 28 U.S.C. §§ 1331 and 1345.

2. This Court may exercise personal jurisdiction over Defendant Triple Canopy pursuant to 31 U.S.C. § 3732(a), because Triple Canopy transacts business in this District by recruiting candidates and advertising for employees in this District.

3. Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a), because Triple Canopy transacts business in this District. Venue is also appropriate pursuant to 28 U.S.C. §§ 1391(b).

4. A civil action for a violation of the False Claims Act may be brought by private persons on behalf of the United States Government under the qui tam provisions of 31 U.S.C. § 3730(b).

5. Relator Brown is the original source of the information and facts upon which the allegations in this Complaint are based. Relator Brown has direct and independent knowledge of the information and facts contained in this Complaint based upon his own investigation and analyses, as well as an investigation undertaken on his behalf through his Counsel. To the best of Relator's knowledge, there has been no prior public disclosure of the allegations contained in this Complaint. There are no known published studies, reports, or articles that have previously identified the schemes identified in this Complaint pursuant to subcontract 11KBOSSSC0051. Relator performed independent research and analyses to confirm, to the best of his ability, the false claims that he identifies in this Complaint.

COMPLAINT AND JURY DEMAND - 2
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

6. Further, the specific allegations contained in the Relator's Complaint are not based upon the public disclosure of allegations or transactions in any criminal, civil, or administrative hearing or any congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation or from the news media related to the subcontracts at issue in this complaint.

7. To the extent that there has been any public disclosure unknown to Relator, Relator Brown is an original source under 31 U.S.C. § 3730(e)(4).

8. Relator has complied with 31 U.S.C. § 3730(b)(2) by voluntarily providing the information to the United States on September 14, 2017, before filing this action and serving a copy of the Complaint upon the Government.

### III. PARTIES

**A. Plaintiff**

9. The United States—specifically, the Department of Defense, including its components—is the real party in interest under the False Claims Act. The United States paid the false claims alleged in this Complaint.

**B. Relator**

10. Relator Michael Brown is a veteran of the United States Military and resident of Arizona. Mr. Brown is a former employee of Triple Canopy and sues under 31 U.S.C. § 3730(b).

**C. Defendant**

11. Defendant Triple Canopy Inc., is an Illinois corporation that is headquartered in Reston, Virginia. Triple Canopy is a private security company providing integrated security, mission support and risk management services to corporate, non-profit clients, and government clients. Triple Canopy's corporate offices are located at 12018 Sunrise Valley Drive, Suite 140, Reston, VA 20191. Triple Canopy was formed in 2003 and then merged in 2014 with Academi, another security contracting company, to form Constellis Group. Constellis Group and its

COMPLAINT AND JURY DEMAND - 3
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

affiliates were then acquired by Constellis Holdings.

**D. Relevant Non-Parties**

12. Constellis is Triple Canopy's parent company headquartered at 12018 Sunrise Valley Drive, Suite 140, Reston, Virginia 20191. According to its public website, Constellis was formed in 2010.

13. ITT Exelis Group is the prime contractor on the 11KBOSSSC0051 contract awarded September 29, 2010. The ITT Excelis group was part of ITT Corporation until October 2011 when a spinoff occurred creating the independent publicly traded Exelis corporation. In 2015 Exelis was acquired by Harris Corporation.

14. ITT Corporation is the prime contractor on the 11KBOSSSC0051 contract awarded September 29, 2011. In October 2011, ITT Corporation was part of the Excelis group spinoff which became an independent publicly traded company.

15. Vectrus is the prime contractor on the 11KBOSSSC0051 contract awarded March 29, 2016. Vectrus was created in September of 2014, when the global services division of Excelis separated to form an independent publicly traded company.

**IV. STATEMENT OF FACTS**

**A. Triple Canopy's KBOSS Subcontract**

16. Triple Canopy is a subcontractor that provides private security support services to the United States Department of Defense to support the United States Army in Kuwait.

17. In September 2010, Triple Canopy was awarded subcontract 11KBOSSSC0051 totaling $1.8 million.

18. In September 2011, $260 million was added to Triple Canopy's subcontract 11KBOSSSC0051.

19. In March 2016, $57 million was added to Triple Canopy's subcontract 11KBOSSSC0051.

20. To date, the total 11KBOSSSC0051 subcontract transaction amount is

COMPLAINT AND JURY DEMAND - 4
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

$320,443,491.[2]

21. The terms of the subcontract required Triple Canopy to provide "all personnel, supervision/management, and non-personal services necessary to perform Base Security Support Services in the Area Support Group Kuwait."

22. Pursuant to the contract, Triple Canopy was required to provide support that meets delineated standards and procedures, including implementing a Safety Program, executing a Quality Control Plan, and other processes. In order to ensure that these standards were met, Triple Canopy was also required to develop, implement, and maintain Standard Operating Procedures ("SOPs") that were to include detailed procedures and specifically identify all functions for each respective functional area. Further, Triple Canopy was required to develop, implement, and maintain security SOPs for each post that outlined the specific duties to be performed by an officer assuming that post.

23. Pursuant to the subcontract, Triple Canopy was responsible for the protection of U.S. Government personnel, property/equipment, and facilities in the Kuwait region.

24. The security service operations to be provided by Triple Canopy to the Kuwait bases were "a critical function during a crisis," and Triple Canopy was responsible for ensuring that enough skilled personnel were available during a crisis for any operational emergency.

25. The security support services Triple Canopy was required to provide included ensuring that sufficient skilled security personnel were available during a crisis for operational emergencies, in addition to providing security and force protection to all Kuwait installations, camps, or "nodes", as required, 24 hours a day, 7 days a week.

26. Triple Canopy was also responsible for providing "all necessary labor to establish and maintain a 24-hour force protection, physical security, law enforcement program."

27. The services required of Triple Canopy included: "police administration, law

---

[2] Search results for subcontract 11KBOSSSC0051 awarded to Triple Canopy Inc., https://goo.gl/JfmxQV (last visited Sept. 29, 2017)

COMPLAINT AND JURY DEMAND - 5
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

enforcement, physical security, access control, static and roving security, security force supervision, support for security and force protection technological equipment."

28. Triple Canopy was also responsible for providing and maintaining properly trained, qualified, and certified personnel, including personnel with appropriate security clearances, certifications, and training requirements.

29. Triple Canopy was additionally responsible for the operation of security force protection equipment and reporting maintenance required for such equipment. This included operating and reporting any problems with intrusion, detection, scanner, tracking, badge/credentialing, and other similar systems, as well as performing maintenance on the various security or force protection systems. Triple Canopy was required to be available for emergency repairs that effect security operations.

30. Triple Canopy was required to perform operator maintenance of the Closed-Circuit Television, Tactical Automated Security System, Vehicle and Cargo Inspection System (or other similar vehicle/container inspection systems), personnel and baggage scanners, mechanical and manual barriers, Guardian tracker systems, as well as any other security or force protection systems.

31. Triple Canopy was also obligated to recommend the acquisition of future devices or equipment to increase safety and security.

32. In particular, the contract obligated Triple Canopy to operate and maintain pass identification services, including constant monitoring of badge exchange processes and identification systems at entry and departure access gates.

33. The contract also required Triple Canopy to provide entry control point services by conducting security checks of all individuals to determine authorization to enter or depart installations.

34. It was part of Triple Canopy's responsibility to ensure that the pass and identification system was operational. It was also Triple Canopy's responsibility to develop,

COMPLAINT AND JURY DEMAND - 6
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1 operate, and perform operational maintenance on the badge/pass system.

2     35.    Triple Canopy was required to provide all necessary security services to conduct Entry Control Point ("ECP") operations, including but not limited to: conducting security checks of all personnel to determine authorization to enter and depart the designated ECPs; controlling personnel and vehicle entry and exit of ECPs; and inspecting all deliveries and vehicles.

    36.    Triple Canopy is required to ensure that employees and lower tier subcontractor employees had the applicable background checks and security clearances.

    37.    Triple Canopy was required to ensure that each security officer was qualified to operate his/her assigned weapon (rifle and pistol) and/or other weapons required for use while on duty or in response situations, e.g., "crew served weapons no less than annually."

**B.   Triple Canopy's Subcontract Performance**

While employed by Triple Canopy, Relator Brown repeatedly observed and disclosed substantial personnel, weapons qualification, and equipment performance concerns to Defendant or Defendant's agents, regarding the failure of Triple Canopy to provide the security services as required by subcontract 11KBOSSSC0051.

    **1.    Personnel Staffing Issues**

    38.    In 2016, Relator Brown was providing security services for his employer, Triple Canopy, at Kuwait installation bases Camp Arifjan and Camp Buehring, under subcontract 11KBOSSSC0051.

    39.    During his employment, Brown observed consistent discrepancies in the number of personnel reported on the daily on-duty personnel roster, as compared to the number of people actually available for that day. Every day, there is a posted "on-duty" roster, listing each protection officer on duty and their assigned location. This roster is a vital piece of information for force protection because it provides a comprehensive overview to all personnel of the team members available to perform the duties and comply with the requirements of the Department of Defense 11KBOSSSC0051 subcontract. Upon information and belief, the on-duty personnel

COMPLAINT AND JURY DEMAND - 7
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

roster is also reported to the Department of Defense on a daily basis. However, the version of the on-duty personnel roster that Triple Canopy sent to the Department of Defense was a "cleaned-up version" of the posted on-duty roster—sanitized to remove evidence of the discrepancies witnessed by Relator Brown and other witnesses.

40. From the time Relator Brown arrived on the base, he routinely observed security personnel incorrectly listed as "on duty" on the daily personnel roster when they were actually off duty, due to time off, injury, or because they had quit and left the country. This was a near daily occurrence.

41. These discrepancies were of great concern to Relator Brown because the lack of sufficient personnel decreased Triple Canopy's security officers' ability to perform daily security services, properly rest, obtain work/shift relief, or respond effectively to emergencies. Relator Brown raised this issue repeatedly with supervisors (Sergeants and Senior Sergeants, also known as "Black Hats"), but never received an adequate explanation. When he reported these discrepancies, he received multiple excuses, such as "people are quitting," "it is summer time so our numbers are low," and "there are high daily call outs," indicating people were calling in sick.

42. For example, on October 25, 2016, the Theater Storage Area ("TSA") guard list showed TSA 4 as M. Rice. In reality, Relator Brown was aware that (or had been advised) that this officer had quit and already left the country.

43. On November 6, 2016, Relator Brown once again observed M. Rice listed on the active personnel board even though he had quit and left the country.

44. Similarly, on November 16, 2016, Relator Brown noticed Sergeant Gregory a.k.a "George" Crouch listed on the active personnel board even though he was out recovering from a spinal injury.

45. Relator Brown also routinely noticed understaffing across many locations on the base, including Camp Buehring security post 6F, and Camp Arifjan security posts EF, 1G, 1G1, and special operations base CF, that according to the Standard Operating Procedure ("SOP") for

COMPLAINT AND JURY DEMAND - 8
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  the posts and the daily on-duty personnel roster, required more than one officer present at all
2  times. Notwithstanding the minimum post staffing requirements, Relator Brown frequently saw
3  these posts with just one guard, which included top secret areas.

4      46.    Relator Brown was also asked by Triple Canopy to run patrols outside SOP. For
5  example, post 6F is a 24-hour roaming patrol on Camp Buehring responsible for checking the
6  entire perimeter of the base, which is near the Iraqi border. Brown was assigned to this patrol
7  randomly during his deployment, for approximately 5 weeks in total. This patrol requires two US
8  citizens—US citizens are called "Westerners." When Relator Brown was first assigned to the
9  patrol, he was told by a Senior Sergeant to conduct the patrol with a Westerner. When no
10 Westerners were available, due to the low staffing numbers, he was told by another supervisor to
11 conduct the patrol with an "Easterner" (a non-US citizen). This contradicted the other
12 supervisor's requirement that only U.S. citizens be assigned to these patrols. It also contradicted
13 the daily on-duty personnel roster listing two Westerners patrolling the location and the special
14 security circumstances the sensitive nature of this location required. Due to its proximity to the
15 Iraq border and the perimeter of the camp, this location required a minimum of two force
16 protection officers that could be armed with weapons. Non-US citizen personnel are not assigned
17 to this patrol because they lack the required security clearances, and they cannot be armed with
18 weapons, making them ineligible personnel for this patrol. Personnel staffing modifications like
19 this happened all the time however, resulting in confusion, and lack of compliance with either
20 the contract, or proper security policies and procedures.

21     47.    Relator Brown is also aware of locations that required roaming patrols 24 hours a
22 day, 7 days a week (different from the main perimeter patrol described in the preceding
23 paragraph), that never occurred during his tenure with Triple Canopy in Kuwait. For example, at
24 Camp Arifjan, there is an Ammunition Storage Point ("ASP") and a Theater Storage Area, which
25 are locked locations within the base containing arms and ammunition. These internally locked
26 down locations required a 24-hour roaming patrol. But Relator Brown never saw a single 24-

COMPLAINT AND JURY DEMAND - 9
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

hour roaming patrol in any of these locations. Nonetheless, Sergeant Victoria Love and Sergeant Gregory Crouch both showed Relator Brown written reports, known as Patrol Activity Reports ("PAR"), and they both admitted that the patrols listed on the PAR every day on the hour *were never conducted.* The records of these patrols are false. Sergeants Love and Crouch admitted to Mr. Brown that they submitted these false reports at the request of their superiors. Sergeants at these posts were required to submit these false reports on the roaming patrols for the TSA and ASP arms and ammunition locations.

48. The consistent understaffing left these bases in Kuwait particularly vulnerable during emergency situations. For example, one of the contractual requirements is the availability of a Quick Response Force (QRF"), also known as the "relief team" or "diversion team." The QRF is, as the name suggests, a group of security personnel that is supposed to be on duty without any other assignments during their shift so that they will be poised to respond quickly in the event of an emergency. Given the understaffing, people (including Brown) would often simultaneously be assigned to the QRF, in addition to their primary post, or other duties. However, the QRF team was intended to provide immediate coverage if the current security officers are injured— something that is impossible to achieve while on duty elsewhere. During Relator Brown's time in Kuwait, he was never aware of a QRF team on base being immediately available to respond to an emergency. For example, on one day between June and July 2016, there were two bomb detonations outside the perimeter of Camp Arifjan. When the detonations occurred, there was no QRF available to lockdown the base restricting traffic in or out, to investigate the bombings, or to provide coverage at the security control points. Relator Brown saw traffic continuing to flow in and out of the base as usual, so he asked his Sergeant why they were not locking the base down. The Sergeant looked confused, but could offer no explanation.

49. Relator Brown also learned that Triple Canopy personnel lacked the "Secret" security clearance required for Camps Arifjan and Buehring. Even though these bases required all personnel to have the proper clearance, personnel lacking proper clearance were assigned to

COMPLAINT AND JURY DEMAND - 10
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

these facilities for multiple years. For example, Sergeant James Naggy told Relator Brown he never had secret clearance. He was initially on base with an interim clearance but after his interim clearance lapsed, he remained on base for three years with no follow up by Triple Canopy to resubmit his clearance.

### 2. Weapons Qualification Issues

50. Relator Brown also found inconsistencies and problems with staffing and completion of mandatory weapons qualification at Camp Arifjan and Camp Buehring. Every security officer on base must immediately qualify for the weapons they use on Camp Arifjan or Buehring. However, Relator Brown learned that there was an officer at Camp Arifjan who could not pull back the charging handle on the M240 machine gun. Charging the weapon is essential for it to fire. The qualification instructor performing the exam charged the M240 weapon for this officer. The inability to charge the weapon on one's own should disqualify the individual. In a live situation requiring the use of the M240 weapon, this officer would endanger the base, because if the officer cannot charge the machine gun without assistance, then the officer will not be able to fire the weapon. The instructor nevertheless "passed" the officer who could not charge the M240 without further training.

51. Relator Brown also saw officers who purportedly passed weapons qualification examinations without having met the requisite requirements for doing so. For example, an officer is allowed two qualifying attempts. If there were officers who still had not qualified after their second round of attempts, the passing group would be dismissed except for the officers that had failed. The next day, Relator Brown would see the officers who had been unable to qualify in the second round listed as having met the weapons qualification requirements.

### 3. Equipment Issues

52. During Relator Brown's employment with Triple Canopy, he also discovered equipment necessary to complete his job and sufficiently secure his location was routinely faulty, did not work, or was insufficient for performing required security services.

COMPLAINT AND JURY DEMAND - 11
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

53. As an example, Relator Brown worked at post 1E / 1F at Camp Arifjan for approximately 8 weeks during diversionary hours. Diversionary hours are from 6am until approximately 9am in the morning. During this time, there usually is a large amount of traffic entering the base. This traffic would back up, and Relator Brown would be told to move further down the line to scan IDs. However, the further down the line one moved, the farther away one would be from the communications equipment. If the scanning device was operated outside the effective range at which it could send or receive information to or from the control element, the scanning device was essentially rendered inoperative. When Relator Mr. Brown scanned an individual's credentials at his assigned entry control point down the line, he would receive no input back regarding the scanned credentials. When he reported this to Sergeant Healed Brock, he was told to "fake the funk," a common response from supervisors, and told to allow the individuals at the check point through with no additional authorization check. Relator Brown was concerned about this approach, since it had potential to cause a major security breach. He went on the NET, which is a radio communication system that broadcasts through Triple Canopy and the US Army, and reported the issue so a record would exist of his unwillingness to take insecure steps in the event a bomber that was there gained access through his post. After reporting this on the NET, Relator Brown did not follow the supervisor's instruction to conduct the "down the line scanning" and moved closer to the antennas where his ID scanner worked. He then scanned an ID which read "Deny Access to Base & Detain." Had he stayed in a location where the scanners did not work, as his supervisor instructed, he never would have received this information, and the individual without proper credentials would have gained access to the base. This "down the line ID scanning technique" that the system was not capable of accommodating, nonetheless was the procedure used every day, even after Relator Brown reported the problem. Relator Brown also suggested moving the antennas or adding additional antennas to allow the scanners to communicate down the line, but these changes were never implemented. These problems were never disclosed to the government or subcontractors responsible for equipment as Triple Canopy

COMPLAINT AND JURY DEMAND - 12
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1 was required to do, or if reported were never resolved. Triple Canopy failed in its obligation to report these problems and by failing to resolve them, did not provide the required services.

54. Relator Brown also learned that there was a problem with camera security systems at Bravo Base on Camp Buehring dating back to 2013. He spoke to Sergeant Crouch who informed him there had been a major flood at the base in 2012. In 2013, the decision was made to build barriers to control flood waters in case another heavy rain occurred with potential flood capacity. While digging for these barriers, heavy equipment severed main communication lines that were never repaired and, therefore, were inoperable during the entire time Relator Brown worked for Triple Canopy. These problems were never disclosed to the government or subcontractors responsible for equipment as Triple Canopy was required to do, or if reported were never resolved. Triple Canopy failed in its obligation to report these problems and by failing to resolve them, did not provide the required services.

55. Relator Brown also discovered faulty video monitoring systems across multiple locations that failed to function. For example, he was assigned to post 2C at Camp Arifjan for approximately 5 weeks in total. At this post, he would be directed to monitor camera systems focused on the undercarriage of vehicles entering the base. The camera monitoring systems he was assigned to monitor never worked. The cameras would not turn on or display anything, other than, (or not even) a fuzzy transmission. Many days, Relator Brown would sit at his post staring at a blank screen on the monitor. One day, when he was seated away from the monitors looking to the side rather than directing his gaze at the non-functioning monitor, a project manager yelled at him, instructing him to fix his eyes on the blank screen. When Relator Brown told him it did not work, he laughed and said to "fake the funk," i.e. pretend that the monitoring system was functioning. Around May or April of 2016, Relator Brown was tired of pointlessly watching Triple Canopy do something that did not work, so he reported the faulty camera monitoring system to Lieutenant Horris Willis, who responded, "why are you such a hard ass" and "just go along and get along." Relator Brown never saw any change or repairs made to the video

COMPLAINT AND JURY DEMAND - 13
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1 monitoring system. These problems were never disclosed to the government or subcontractors responsible for equipment as Triple Canopy was required to do, or if reported were never resolved. Triple Canopy failed in its obligation to report these problems and by failing to resolve them, did not provide the required services.

56. Relator Brown learned during his employment that metal detectors and hand held explosive meters did not function or operate properly because qualified equipment personnel were fired and nothing was done to train current personnel or hire knowledgeable personnel to replace them. The handheld systems required technical calibration, and the individuals assigned to work the equipment were non-US citizens who were never properly trained. The locations he worked at where this problem existed included post 3E at Camp Arifjan. Relator Brown is also aware of other posts that had similar problems because he would discuss the problem with other officers who reported the same issue. Relator Brown reported these issues to senior leadership throughout his time in Kuwait, but did not see any change in the problem. He soon realized, a few months into his employment with Triple Canopy in Kuwait, that nothing was going to be done to fix the problems he reported, so he became frustrated. These problems were never disclosed to the government or subcontractors responsible for equipment as Triple Canopy was required to do, or if reported were never resolved. Triple Canopy failed in its obligation to report these problems and by failing to resolve them, did not provide the required services.

57. Relator Brown also worked at posts ECP2 Tier 1 and Tier 2 at Camp Arifjan. This location has vehicle barricades built into the ground. These barricades are designed to shoot straight up from the ground when triggered by an officer to restrict vehicle access. Relator Brown and other security officers were required to test these barricades daily. At the posts Relator Brown worked at, the barricades never functioned, failing each test he ever performed on them. He repeatedly reported this issue to Senior Sergeants, but the faulty barricades were never repaired. These problems were never disclosed to the government or subcontractors responsible for equipment as Triple Canopy was required to do, or if reported were never resolved. Triple

COMPLAINT AND JURY DEMAND - 14
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1 | Canopy failed in its obligation to report these problems and by failing to resolve them, did not provide the required services.

58. Relator Brown also reported issues to his supervisors with the weapons and ammunition provided to them to perform his security duties. He had ammunition magazines that would not hold ammunition properly, with the ammunition literally falling out of his weapon. Weapons frequently were not cleaned properly, which could result in malfunctions. For example, when Relator Brown toured a guard tower at Camp Arifjan, he saw an M240 machine gun caked in dirt, indicating a lack of proper maintenance. Relator Brown also knows of reports identifying M4 firearms with missing firing pins, rendering the weapons useless. When he reported the problems with the functionality of the weapons and ammunition, his concerns were brushed aside by supervisors and dismissed, and he was told to not worry because nothing will happen requiring the need for any weapon. Relator Brown also saw multiple Sergeants take their personnel back to the arms room to demand better functioning equipment for them. Requesting a swap in equipment however did not guarantee better equipment since most of the weapons were deficient. These problems were never disclosed to the government or subcontractors responsible for equipment as Triple Canopy was required to do, or if reported, were never resolved. Triple Canopy failed in its obligation to report these problems and by failing to resolve them, did not provide the required services.

59. In general, when Relator Brown started reporting these items to senior supervisors, they started trying to avoid him because he was, in essence, questioning whether they were providing security with all these problems. The senior supervisors also began to just smile at Relator Brown when he reported problems, but there would be no follow up from them.

## V. DAMAGES

60. Defendant Triple Canopy profited from the personnel scheme, weapons qualification failures, and equipment malfunctions described in this Complaint, and the United States Government was made to bear the cost. Triple Canopy's performance under subcontract

COMPLAINT AND JURY DEMAND - 15
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

11KBOSSSC0051 failed to conform to the requirements enumerated in the contract. With knowledge that its performance did not meet the subcontract requirements, Triple Canopy nevertheless presented claims for payment of services to the United States Government. By seeking payment for services that it had not performed, Triple Canopy knowingly presented false claims for payment to the United States Government. Moreover, because Triple Canopy sought payment from the United States Government under the terms of a contract that Triple Canopy had already breached, without first notifying the government of its failure to perform, Triple Canopy's requests for payment under the contract were false. From 2010 to the present, Defendant's actions knowingly caused millions of dollars in false claims for payments pursuant to subcontract 11KBOSSSC0051 to be paid. Those false claims caused the United States Government to disburse tens of millions of dollars in payments that should not have been paid for services that were never delivered.

## COUNT I—
## FALSE CLAIMS 31 U.S.C. § 3729(a)(1)(A)-(B)

61. Relator re-alleges and incorporates all allegations in Paragraphs 1 through 60 as though fully set forth herein.

62. Relator brings these claims against Defendant on behalf of the United States for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, for knowingly presenting, or knowingly causing to be presented, for payment or approval, false or fraudulent claims to the Government based upon a false representation that Defendant Triple Canopy provided sufficient base security support services at Kuwait installations under subcontract 11KBOSSSC0051. From on or about 2010 through the present, Defendant Triple Canopy knowingly and willfully violated the FCA by causing false claims for payment to be submitted.

63. As a result of the acts described above, Defendant knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval pursuant to contract 11KBOSSSC0051 to the United States in violation of 31 U.S.C. §3729(a)(1)(A).

COMPLAINT AND JURY DEMAND - 16
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Case 1:18-cv-00413-LO-TCB Document 8 Filed 04/12/18 Page 18 of 20 PageID# 70
Case 2:17-cv-01479-JCC *SEALED* Document 1 Filed 09/29/17 Page 18 of 19

64. Further, as a result of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. §3729(a)(1)(B). As a direct and proximate result of the Defendant's violation of the FCA, 31 U.S.C. §3729(a)(1)(A), and (B) and/or 31 U.S.C. §3729 (a)(1), (2), and/or (3), the United States has sustained damages in a substantial amount to be determined at trial and is entitled to treble damages plus a civil penalty for each violation.

## VI. PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendant as follows: (1) awarding the United States damages in the amount of the United States' damages, trebled, as required by law; (2) imposing civil penalties as are required by law; (3) awarding attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case forward; (4) awarding Relator the maximum amount allowed to him pursuant to the FCA; and (5) entering any such other order and further relief as this Court deems proper.

## VII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a trial by jury of any and all issues in this action so triable.

RESPECTFULLY SUBMITTED this 29th day of September, 2017.

DATED this 29th day of September, 2017.

KELLER ROHRBACK L.L.P.

By _____
Juli Farris, WSBA 17593
Laura Gerber, WSBA 34981
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900, Fax (206) 623-3384
jfarris@kellerrohrback.com
lgerber@kellerrohrback.com

COMPLAINT AND JURY DEMAND - 17
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Eric Fierro, *pro hac vice forthcoming*
KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
(602) 248-0088, Fax (602) 248-2822
efierro@kellerrohrback.com

***Attorneys for Plaintiff-Relator***

COMPLAINT AND JURY DEMAND - 18
FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

17-CV-01479 JCC

**JS 44** (Rev. 06/17)      **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
UNITED STATES OF AMERICA, ex rel. by MICHAEL BROWN

### DEFENDANTS
Triple Canopy, Inc.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: **Fairfax**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Laura Gerber, Keller Rohrback LLP, 1201 Third Avenue, Suite 3200, Seattle, WA 98101, (206) 623-1900

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION
[X] 3 Federal Question (U.S. Government Not a Party)

### III. CITIZENSHIP OF PRINCIPAL PARTIES
(For Diversity Cases Only)

### IV. NATURE OF SUIT
[X] 376 Qui Tam (31 USC 3729(a))

### V. ORIGIN
[X] 1 Original Proceeding

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing: 31 U.S.C. § 3729-3733
Brief description of cause: Civil qui tam action alleging failure to provide security services

### VII. REQUESTED IN COMPLAINT:
JURY DEMAND: [X] Yes

### VIII. RELATED CASE(S) IF ANY
JUDGE _____ DOCKET NUMBER _____

DATE: 9/29/17    SIGNATURE OF ATTORNEY OF RECORD: *[signature]*

FILED / LODGED / RECEIVED
SEP 29 2017
AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____